Good morning, your honors. May it please the court, Timothy Scott for the appellate Albert Ortega. This is a co-defendant case, and so I'm going to limit myself to half of the allotted time, so that counsel for Mr. Magana can argue the cause for that defendant. Your honors, Albert Ortega was convicted and sentenced to a life sentence, despite being represented by an attorney who had an actual conflict between him and an unindicted co-conspirator. This violated his right to conflict-free counsel under the Sixth Amendment, and it should lead to reversal on the facts of this case. I would suggest to the court that there are three questions that need to be resolved in order to resolve the case as a whole. The first is whether there was an actual conflict in the representation of Mr. Ortega and an unindicted co-conspirator. The second question is whether that conflict, quote, likely affected the representation. And then finally, whether the court should indulge the government's argument that we should, in essence, kick the can down the road and resolve this in a 2255 proceeding. Now- Your last comment is my concern, because isn't there some fact-finding that has to be done on this question? Not on this case. There's three reasons why I think we ought not defer justice to a 2255 proceeding. The first is that, in contrast and distinguishing from the cases that the government cites, the actual conflict is apparent on this record, and that's really the key to our analysis. The government cites cases like Miskinnis and Ross and Hanum, where the very fact of the conflict is in dispute. For example, in Miskinnis, there was some allegation that perhaps the attorney had given certain tax advice, I believe it was, to a defendant. But there was no evidence as to whether the defendant heard the advice or would have said that he had received the advice, or moreover, whether he relied on the advice. So there was a fundamentally unanswered question as to whether the conflict actually had come to a head. And so that needed more fact-finding to suss out those facts. The same is true as the Ross case. It's nearly identical facts. And as to Hanum, it's very similar in that the question was whether the attorney's finances presented a conflict with regard to the client. And all of those things were in some question. Well, then are you arguing that this is structural error? Because normally you would have to show that the actual conflict likely affected the lawyer's performance. That's right. I don't know if structural error is the term that the court has used in the past. But what the court does is that if it finds an actual conflict that had a likely effect, then that's the end of the inquiry. Prejudice is presumed after that, whether we call that structural or just presumed prejudice. The result is the same in that there's no harmless error analysis. Well, you're saying it's an actual conflict because somebody else in this firm is representing Mr. Hildago, right? He represents the firm or him. It's the same in the eyes of the law. Because it seems to me if we get down to, well, what would have happened, would there have been any plea based on turning over Hildago? I mean, that all looks kind of unlikely. You know, Mr. Ortega did not cooperate, and he had federal public defender counsel for a long time, and there was no attempt to do anything. So it looks to me that if you actually want us to reverse rather than kicking the can down the road as you say it, it would have to be something that's like structural error. Well, it is presumed prejudice. And if I can answer those questions in turn, I am arguing that it's an actual conflict because the firm or the attorney represents two people implicated in the same crime. And it's really almost, not almost, it really is as simple as that. The Lockhart case speaks to that. The Christakis case and the Lewis case all speak to that. It matters not that the other person was not charged in the same offense, as long as they're an unindicted co-conspirator and the evidence points to them being in the same crime or the same alleged crime. That is enough under the law to constitute an actual conflict. That was the facts, in fact, of Lockhart as well as Christakis as well as Lewis. Maybe Lewis was co-defendants, but Christakis and Lockhart were definitely both unindicted co-conspirators versus the person who was on trial. Did Odago testify at trial? He did not. He was subpoenaed, and then for reasons that are unclear on the record, he was not eventually brought to trial. But I believe I can speak to the likely effect, as it seems to be of some concern. Now, to answer the question about whether he would have cooperated, the answer to that is he hadn't yet. Now, he also hadn't been close to doing a plea before, but the evidence shows that a plea had been tendered and they were very close to resolving the case before it broke down. Anecdotally, and common sense tells us that very often decisions about pleas and how it's going to be resolved and whether there's going to be cooperation happen when trial is impending and it focuses the attorney's attentions and the party's attentions on the case. So I don't think it's fair to suggest that past is always prologue when it comes to whether you're going to resolve a case and how. Now, cooperation is not the only opportunity that was lost to Mr. Ortega. There was also the fact that he could not run a third-party culpability defense, to put it bluntly, to try to blame Mr. Hidalgo at trial. Now, this is not mere speculation. This would have dovetailed perfectly with his stated theory of the case. As the government pointed out in its arguments, Mr. Ortega's specific defense to the drug crime, and bear in mind that the drug crime is the one that resulted in a mandatory life sentence, his defense to the drug crime was, I am a personal user, I am a drug addict, and any drugs that were found at my place were for my own personal use. Now, you couple that with the evidence that the government itself put in that Mr. Hidalgo, in a separate apartment, was the one who had scales, digital scales more than one, that had packaging materials, that had cutting agents, the sort of mixer that could be used to stretch drugs into larger for-sale amounts. It was Hidalgo who had all of the indicia of sales in his apartment. And so for Mr. Ortega to say at trial that his defense was that he was merely a personal user, any defense attorney worth his salt, and by that I mean any unconflicted defense attorney, would have said, and here is the person who is doing the selling. My client is merely a user, but look at the scales and the packaging and the cutting agent over in Mr. Hidalgo's apartment. That is the person who is selling drugs in this case, not my client, the personal user. Now, would that defense have prevailed? Maybe, maybe not. Perhaps it isn't the strongest defense at trial, but it's the defense that they chose to pursue, but it was missing that key part of third-party culpability to explain the rest of the evidence. Do we have to consider prejudice? Let's say all this is true. Do we have to consider prejudice? I mean, in the end, and whether there was any prejudice here? Not at all. Absolutely not. The only thing that we have to decide is whether an effect was, quote, unquote, likely. You're saying this is one of those things the Supreme Court has left. You're really saying it's structural. I thought, to me, structural error is not having to prove prejudice. Right. Am I got this wrong? Well, then let's call it structural error. Okay. And this is one of the things that's left? Yes. Yes. Once the effect is likely, prejudice is presumed, or it's structural error, if you want to describe it that way. And the reason for that, in the Holloway, the Supreme Court case, Holloway speaks to this. The actual conflict you're saying, which creates the structural error, is that they were two co-conspirators represented by the same law firm. Correct. It's as simple as that. Okay. The same firm, or was it Christopher Darden representing them both? I'm not sure as I stand here. It may have been his firm, but that's a distinction without a difference in the eyes of the law. And what's the case that says that's structural error? Lockhart. Lockhart. Okay. Discusses that repeatedly. Holloway is the lead Supreme Court case that says. Okay. And the reason Holloway says that is we can't rely on the record to determine prejudice, because the record itself is compromised by the things that the attorney was not permitted to do ethically. And maybe that's why you have an actual hearing on the 2255 to decide what was compromised. The last two answers to that. The first one is that the actual conflict is already apparent. So that distinguishes those other cases. The second, though, the second more fundamental fairness problem with that, and so I don't steal from my colleague and I finish my answer if I go a little over ten minutes. You can finish your answer. Thank you, Your Honor. The second problem with this is that, respectfully to the government, they have unclean hands in making this argument. It would be fundamentally unfair for the government to raise the waiver issue but in the same breath say that it can be waived and to set a hearing and stand by while what they now acknowledge is a lawfully deficient waiver take place. They conceded that, right? Right. So it's unfair for them to essentially solicit the waiver, stand by while the deficient waiver goes down, which then precludes any further discussion of the issue, and then to turn around and argue we should prevail on appeal and we should force Mr. Ortega as a pro se litigant to pursue a 2255 petition and hope for the best. That is fundamentally unfair. But the unclean hands, I think, go deeper than that. The government in its declaration to the court, and this is at ER page 824, all that the government represented to the district court was that Hildago had appeared on the wiretap calls and appears to be an unindicted co-conspirator on the drugs. That's all that the government shared with the court. What the government either then knew or quickly developed for trial, but it seems like they knew it then, was that there was this mountain of evidence, physical evidence, testimonial evidence, and other evidence that the government was fully intending to introduce tying Mr. Hildago to Mr. Ortega. The government explicitly argued in their closing arguments that you can infer sales and you can convict on sales because of the evidence in the Hildago apartment. At a bare minimum, the government should have advised the court, and Mr. Ortega should have been advised, that it was going to introduce Government Exhibits 96 through 103, I believe it is, that it was going to argue strenuously that Hildago and Ortega were joined at the hip and that they are the ones that are responsible for sales. Instead, what happened was that they participated in the waiver, at least passively, that foreclosed any further discussion, and then they buried Mr. Ortega with all of this Philip Hildago evidence with nothing whatsoever that Mr. Ortega's counsel could have ethically done about it. So it's essentially a fairness argument, an equity argument, that it would be unfair to punish Mr. Ortega in the sense of making him, again, probably pro se, litigate this in a 2255 proceeding when the government itself led him down this path or participated in doing that. That would be fundamentally unfair. The record is adequately developed. And one final point, if I may. A 2255 proceeding could only result in one of two things happening. Either the attorney, the conflicted attorney, would say, This is my fault. I didn't pursue the Hildago third-party defense and I didn't cooperate against him because I was conflicted. Now, of course, that would augment Mr. Ortega's claims and we would be where I argue we are today. But then the only other thing that could help the government is for Mr. Darden to sort of justify his behavior or suggest that there were strategic reasons. And our court's case law, the Lewis case in particular, says that we take testimony like that with a grain of salt, that it doesn't stand on face value because post hoc justifications by the attorneys are not to be given that much weight. So the 2255 won't speak to the actual conflict. That's already apparent in the record. All it can speak to is the motives. And as we've discussed, that's meager evidence at best for the government, if not evidence that's helpful for Mr. Ortega. Thank you. Good morning, Your Honors. And may it please the Court. Myra Mossman for Michael Magana. There's two matters before the Court. And unless you have any objections, I'll first address the issues, some of the issues presented in the opening and reply briefs and then move on to the motion to expand. I want to first touch on the wiretap suppression issue.  His initial ruling was correct, and the tape should have been suppressed. The record shows that the initial order relied on Special Agent Gutierrez's affidavit, which misrepresented and overstated the probable cause in this case against Mr. Ortega. This, for instance, the Court relied on a confidential source that said Ortega sold cocaine in the kilogram amounts. He eventually had, he would sell methamphetamine in the pound amounts and would have two to three pounds on hand at any time, and that Mr. Ortega was a crack cocaine manufacturer out of one of his residences. And that proved to be the probable cause was not, was overstated. This case is distinguishable from the Second Circuit cases the government relies on, Marsorelli, to show subterfuge. And we believe, Your Honor, that this case is a poster case for subterfuge. You're challenging the wiretap, is that right? Yes. I'm just wondering, since your client was not a target of the authorization and was not on most of the calls, does he have standing? I'd like to address that, Your Honor. The government addressed that in the vouching issue, and they cited United States v. Pedregon, which is an unpublished opinion, stating that our client, my client does not have standing. But Pedregon is distinguishable because although he was not the target of Fenn, it was not his targeted foe. Pedregon case, that in the tape conversation, Mr. Pedregon was only referred to. This case is distinguishable because Mr. Magana is allegedly said to have engaged in conversations on those wiretaps and that his voice was on those wiretaps. And so we believe he certainly has standing to address this constitutional violation. And I actually was counsel of record on Pedregon, and the government cited that in their brief, this little distinguishing point that Mr. Pedregon was never his voice was never heard on the tapes. He was only referred to. And that's distinguishable. If the wiretaps are in, how is that error not harmless? If the wiretaps are in, how is any error not harmless? If the wiretaps are not in? Are in. Are in. It's our position that there was not overwhelming evidence, and this gets actually to the question of the proper cross-examination in this case. That the counsel was not allowed to penetrate, to probe, and to bring out the actual conflicts that are in what's in the affidavits and the actual reality of what happened at the seizure and the arrest of the victim. The use application of the wiretaps reads like a pulp fiction novel. It's a very small description of what a kidnapping is in a rescue, and it leaves out very salient factors of what happened in this case. The victim was under arrest. He was arrested. He was under arrest when he gave the statements that alleged that he was a kidnapper, that he was kidnapped. The government never discloses this until trial, when it's brought out at trial. None of the pretrial proceedings, the detention hearings, they don't disclose the fact that the victim was under arrest. They also don't disclose in the use application that five warrants were executed at that time, and they yielded very little results, which would go to counsel's argument that the small amount of methamphetamine that was found was for personal use. It was actually under two ounces. They don't disclose that the victim was found at a hotel at a meth party. That was not disclosed. And it's highly unlikely that a judge would actually sign off on this use application after the fact use application. And just back to your point, Judge Murguia, Your Honor, that the vouching in this case was extensive. The government at least spoke seven to eight times about the court-authorized wiretap, that these investigations stemmed from the White House. It's possible that he was trying to convince himself that these were good – was a good wiretap. And so – and furthermore, with the application, there was nothing in the application that stated that Mr. Rosenberg had any idea what was in these conversations. The application is actually silent. There's only a promise to file under seal the wiretap tapes. And so there's nothing that suggests that anything actually happened. There was nothing in these tapes that was brought to the attention of the Assistant U.S. Attorney. In fact, no record exists that was submitted as the wiretap tapes. These were all signed off sometime before trial. There's nothing in the record that shows there was an original copy of these if, in fact, they exist. I'd like to also just end with a small point about the insufficient jury instructions and insufficient limiting instructions in this case. The Ninth Circuit, Suarez-Martinez, 217, Fed 3rd 754, the case requests that – there was a request for severance, and it was denied, and this Court said that under those what evidence goes to which counsel – which evidence should be heard – which evidence goes to which defendant in this case. And that never happened here. It was just only a limiting instruction at the end of trial. I have a few minutes. I'd like to resume with that, Your Honors. All right. Thank you, Counsel. Good morning, Your Honors. May it please the Court Assistant, United States Attorney Kevin Rosenberg, for the government. I'd like to begin by addressing the alleged conflict of interest claim. First of all, it's the government's position that the record is absolutely not sufficiently developed here. I don't think the factual scenario that counsel paints is as clear as the record would support in that counsel says it's either Mr. Darden's going to say, I was affected, or he's going to try and justify it. I mean, he says it's structured. As I understand it, when you raise this for the first time on appeal, you have to show that it likely affected the proceedings. Have I got that wrong? I think you have that right, Your Honor. The standard is that there was an adverse effect on the performance, and I think that's defined as a likely effect on counsel's handling of aspects of the trial. So that's the definition that comes from the case law. Okay. So that sounds like a factual inquiry to me. I agree. I agree. I think there are significant questions that need to be developed here. For example, what kind of discussions, if any, were there between me and defense counsel regarding the defendant's cooperation? Please. And as I think Your Honor pointed out, the defendant was represented for six months by the Federal Public Defender's Office, and there's nothing in the record to suggest he ever tried to cooperate during that time. And about a month before trial, when Mr. Darden was substituted in, there's simply nothing in the record to suggest one way or the other whether there were any discussions about that. Two, what was the defense's willingness to accept responsibility at all? He did try to plead guilty, and that didn't go through, and the record speaks for itself about that. What was the government's willingness to offer him a cooperation plea in the first place? I can certainly share my thoughts about that standing here, but the record is not developed on that point. And as we argue in our brief, it's very unlikely that the government would have engaged in that type of plea with the defendant a month before trial, and he's the lead defendant, the most culpable defendant in this particular scenario. The idea that the government would let him cooperate against Mr. Hidalgo, I think, is just something that defies the Court's common experience about how these matters get handled. And perhaps most importantly, what kind of discussions, if any, took place between Mr. Hidalgo and Mr. Ortega? While the government agrees that the waiver that took place in court in and of itself is not sufficient, it's entirely possible that the record would be developed to reflect that there was an actual waiver, that Mr. Darden did talk to him. Mr. Darden was not the attorney who was present at the status conference and the hearing. It was his co-counsel. I think there was kind of a form, I don't mean an actual form, but a scenario that you go through for waiver of counsel conflicts, and that it was pretty well established what you have to ask. There are some standard questions that should be asked, and they were not asked here. I think the suggestion that the government is at fault and that somehow we've tried to engineer this situation, I think, is belied by the record. That's simply not the case. The government brought this matter to the Court's concern out of an abundance of caution as soon as we learned about it and shared the information that we received from Mr. Darden. And it's not clear from the record whether Mr. Darden represented Mr. Hidalgo or not, although I agree, for purposes of the ethical rules, it's an imputed conflict. But I think that could be an important point. If it's a different lawyer in the firm and Mr. Darden had nothing to do with it, that may make a difference, maybe not, on the facts of the matter. So there are lots of questions here, and I think it is important that if... I was just going to ask, if there is a conflict, does harmless error review fit into this, or is that a different track? I don't think it's a harmless error. I think the first step is whether there's an actual conflict, and then the second step is did that likely have an effect on counsel's handling. And so we don't go to the issue of whether there was so much evidence that this was going to happen. We don't go there. I don't think we go there. But I think if the court does decide that there is enough evidence on this record to examine this issue, I think if you get to this question of likely effect on counsel's handling of aspects of trial, I mean, the failure to cooperate part, I think the court could easily find that this just simply wouldn't have happened here. It's not the kind of situation that would happen. And then with respect to the trial, this idea of a third-party defense, I mean, remember, during cross-examination, Mr. Darden did ask the officers about the fact that Mr. Ortega wasn't linked to the items found in Mr. Hidalgo's house, the drug scales and the other indicia of drug trafficking. So he did establish that the defendant wasn't linked to that. And I think what more was he going to do? I mean, he's going to ask one more question, as counsel suggests. I don't think that would really make a difference here. And I think he did, in fact, try to implicitly make that showing. So I think for a variety of reasons, the court should simply decline to entertain this issue and let the defendant file the appropriate proceeding, the proceeding that the statute provides for, which is a 2255, where a full factual record can be developed. And I think one case that's important to remind the court about is this Christakis case from 2001. And that was this court reviewing a 2255 petition. And in that case, there was a declaration from defense counsel where he said, I basically wasn't going to explore cooperation because it was going to implicate another client of mine. We have nothing like that here, and this court was sent the matter back for further hearing on that issue. So I think that's what the government would suggest with regard to that issue. Turning next to the issue of the evidentiary issues, the first thing that I'd like to talk about is this alleged vouching challenge by Special Agent Gutierrez. And it's important, and I'm going to refer to the record specifically at pages, Defendant Ortega's excerpts at pages 616 to 618. And what Agent Gutierrez said about the White House is he was explaining what the task force is where he works. And he said, it's part of a program under the White House, Office of National Drug Control Policy. It's a specialized task force. And he goes on to say the primary mission is to dismantle and identify mid- to high-level drug trafficking organizations. That's it. He didn't say the White House approves of this prosecution, the White House is behind this case. He didn't say anything like that at all. It was a passing reference simply to explain where he worked and what they do, where he works. Was this one of the ones that wasn't objected to at the time? That's true. Okay. Correct, Your Honor. It was plain error? All of this vouching, all these vouching claims are reviewed for plain error. With respect to the discussion of the wiretap process, this case is nothing like the Brooks case. All that was said here basically is that they obtained a court order to allow for interception of telephones. That's at pages 617 and 618. Obtained a court order that authorized us to conduct a wiretap on that telephone. I obtained a court order that allowed us to wiretap that telephone. That's it. Didn't say anything about this. You don't have a question? Well, you're talking about wiretaps. I'm curious for your position on whether Mr. Magana has standing to challenge the wiretap. He has standing to challenge the wiretap. The point the government was making in this vouching area is that the courts draw a distinction in examining the vouching claim when it's the defendant's phone that's tapped versus not the defendant's phone. That's all the government was trying to establish there, that in this context, with this regard to this issue of vouching, the courts seem significantly less concerned when it's not the defendant's telephone. But so with respect to what- I thought, and maybe I'm just way off here, but in United States v. Gonzales, that's a Ninth Circuit decision here. It says only an individual who is a party to any intercepted wire or electronic communication or a person against whom interception was directed may challenge a wiretap. So does he fit within that? I think he fits the party that was intercepted because he was intercepted speaking to the defendant on the wiretap. So we don't think that he lacks standing in that regard, and I don't think we made that argument actually at the district court. So with respect to this vouching, it's nothing like the detailed cases where counsel went on and on explaining that judges reviewed this, that attorneys in Washington, D.C., and so forth. So that's clearly not plein air in the government's view. The second area that counsel raised, although they didn't address it in argument, is this conversation about the investigation in general, narcotics investigation, and booking photos. And what Detective Hoffman said with respect to booking photos, and this was objected to, is he says he's conducting a narcotics investigation involving Mr. Ortega. This is at Ortega's Excerpt 321. I was assisting Special Agent Gutierrez in the investigation as the handling detective within Montebello. What specifically did you do as part of that investigation? Numerous surveillances, spoke to informants, gathered intelligence regarding Mr. Ortega. When you were conducting surveillance, did you see Mr. Ortega? Yes, I did. How did you know what he looked like? Off previous booking photos and driver's license information. That's it. That's all he said. The problem that comes up in the cases where booking photos are mentioned is when there's a suggestion that the defendant had a conviction, and that testimony is emphasized and it becomes the thrust of the testimony. Here is a passing reference. This trial was seven days long, and this is simply stated to explain how this detective knew what the defendant looked like. And was there an objection at that time? There was. Okay. There was, yes, and it was overruled. But again, it's a passing reference, and certainly the judge did not abuse his discretion, I think, by ruling that. And even if it was erroneously admitted, there's no prejudice here. The evidence is overwhelming against both of these defendants. And so that statement would not be the kind of statement in and of itself that should lead to any sort of reversal. Did the defense counsel have an opportunity to update their opening statements after the sort of last-minute reversal or change of opinion by the district court? He did. He had several hours. There was a break before the openings began in the afternoon session, and he had several hours to do that. And he, in fact, did give an opening statement that laid out his theory of the defense. And I would submit, frankly, district court judges have the discretion to not allow anybody to use PowerPoints, and some judges don't let people use PowerPoints in their openings. And so here, the judge, I think, would not have even abused his discretion. I think it was the substance of what was in the PowerPoint, not the use of the PowerPoint. He said he threw away his – he had to throw away the whole thing because the judge changed his mind overnight on the – what would be allowed in. That's true. It was the substance. It's not the actual use of the PowerPoint. That's the concern. I understand. And I think the record shows that he did have more than sufficient time to rework that. He did give an opening. He did outline his theory of the defense, and he was successfully able to present that in a cogent way. And so I would argue that there is no prejudice there at all. With respect to the cross-examination and the limited – the argument that there's limited cross-examination of the kidnapping victim, there are basically four areas that I can tell that appear to be what the defendants are arguing about. One is this relocation funds. Two is about the victim's, quote-unquote, drug-dealing lifestyle. The third is the effort to recall the victim. And the last is this purported limitation that was placed on cross-examining the agent about suggestive interview techniques. So first, with respect to the relocation funds, there was significant testimony about funds that were given to the victim, Vince, and what he did with them and how the funds were not accounted for. Special Agent Gutierrez, in his direct testimony at pages 674 and 675, testified that the victim was given funds. He's the one who gave him the funds. On cross-examination, the – by defendant – on cross-examination by Defendant Magana, at pages 439 of the record, he asks Agent Gutierrez, I believe you're referring to the time where I gave him money. Yes, the money. Do you recall how much you gave him? $4,780. Now, was he supposed to do something specific with that money? Yes. What was that? He was supposed to rent a U-Haul or similar type of truck, pack up his belongings, relocate out of the area. Now, was it your understanding that he was going to relocate out of state? Yes. Going on, the question is, part of the instructions that you provided him when you gave him the money was, one, that he needed to report to you on a continual basis, correct? Yes, that's correct. He didn't do that. He did not. And the money that was to be spent that you just testified to, correct? That's correct. And here's an important part. And was he to provide you with receipts? Yes. Did he provide you with receipts? Yes. Very few, but with some. It didn't total the amount of money you had given him, did it? No. It was considerably less. Yes. So that's one aspect. Defendant Ortega, one of the first questions he asks the agent on cross-examination at page 453, you told us that you gave Vince $4,780 in December. Is that correct? Yes. Was that in cash? Yes. And the receipts that he gave you in January, in your reports, you described those receipts as miscellaneous receipts. Yes. The receipts totaled about $200, right? I believe $270, $200, $271. I can't recall. We're right around that neighborhood. That was about $4,500 in cash, basically unaccounted for, correct? On paper, yes, that's correct. Vince was cross-examined about that as well, that he didn't use all the money for relocation. So that matter was extensively developed, extensively developed, on the existing cross-examination that took place. And the additional questions that were going to be answered were well within the district court's discretion to deny that continuing going over that same area over and over again. The second area, with regard to Vince's supposed drug-dealing lifestyle, what they wanted to ask his girlfriend was, based on your relationship with Vince, would it be safe to say that his sole occupation is as a drug, the court? No, this is cross-examination of this lady's testimony. They were trying to ask her, basically, if he's a drug dealer. And the court declined to allow inquiry into that area. And that's at Excerpt 242. But that fact wasn't in dispute. That was clearly testified to by Vince during his direct testimony. He admitted that he sold drugs. He admitted that he did it for many years. It wasn't in dispute. So asking his girlfriend to confirm that adds nothing. There was never any dispute about that fact. The effort to recall the victim, each point that they laid out in their request to recall the victim was as to an area that was already covered extensively, or the defense had the opportunity to cover those areas extensively. There was nothing that they wanted to ask him that they didn't have the chance to ask him. Now, if they moved on voluntarily, which they did a few times, that's their choice. They may have had tactical reasons for doing that. We don't know. But they had the opportunity to meaningfully cross-examine Vince. And a limitation on cross-examination does not violate the Confrontation Clause unless it limits relevant testimony and prejudices the defendant and denies the jury sufficient information to reprise the biases and motivations of the witness. And this jury had more than enough evidence to evaluate Vince's credibility. They knew that he was a convicted felon. They had two felony convictions. They knew he had to be arrested as a material witness, that he was wearing an ankle monitor, and that it went off while he was testifying, and that he didn't use all of the money. And they did attack him at every turn. And Ortega's life sentence is based on a certain amount of drugs or multiple convictions? Both, Your Honor. The conspiracy involved more than 50 grams of actual methamphetamine, which triggers the 10-year mandatory minimum sentence. The government filed informations pursuant to 21 U.S.C. 851, which alleged two, I think you had three, but at least two prior narcotics convictions. And those matters were found to have been proven at sentencing, and that then generates the mandatory life sentence. All right. So. What's the practice? I mean, is it of this judge or in your district not to send a copy of the jury instructions back to the jury? It varies from judge to judge. Every judge does it differently here. I think a judge real clearly does not, but it's within his sound discretion to decline to do that. In this case, the charges were relatively simple, you know, a lot of facts, but the law wasn't particularly complicated. There were only a few different counts. The jury had no problem. So do they get a copy? What do they get? They just get the verdict form? They get the verdict form. And they asked questions during deliberations that were answered, and so they clearly knew that if they wanted to clarify something, they knew how to do it. And here there was no abuse of discretion to decline to send those instructions back. The very last point with respect to the witness cross, I will say, is that defense counsels raised this argument about inability to cross on suggestive interview techniques. And I've read the brief, and I don't see anywhere in the trial transcript where they even tried to do that. I think this appears to be an argument that's coming up now for the first time on appeal, much like seeming to challenge the authenticity of the wiretap, some suggestion that the calls weren't really the calls that were recorded. And so there's just nothing in the record that supports that they tried to suggest that the agents or officers basically were feeding a story to Vince. So they had more than sufficient opportunity to cross-examine. Here there was a mountain of evidence against these defendants. They were intercepted on the wiretap. The wiretap corroborated the victim's account. Independent surveillance corroborated the victim's account. Law enforcement seizures corroborated the victim's account. And if you remember, they took the victim's version of events shortly after he was arrested. And why didn't they arrest him if they thought he was the victim of kidnapping? I think initially they weren't really sure who was whom in this hotel room. And they go in this hotel room, and they didn't really know what was happening. And I think they arrested him like they arrested everybody there just to secure the scene, and then they took him back and got his story. But if they believed that he was kidnapped, why'd they wait two days to go rescue him? They acted as fast as they could. It was about 18 hours from the first call to the time of the rescue. And I see I'm over time. You can answer the question. So they weren't sure what was going on. It took time for them to figure out where the defendants were. They had to use the wiretap and the information to go conduct surveillance and try to assess the situation. And it took time for them to do that. So for all these reasons and the reasons set forth in the brief, the government would ask this court to affirm the convictions and Mr. Ogana's sentence. All right. Thank you, counsel. Thank you, Your Honor. All right. United States v. Ortega and Magana will be submitted.
judges: Restani, Wardlaw, Murguia